## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JOHN GREGORY GARZA,
a/k/a "Mikey Chuddington,"
a/k/a "Jonathan Davis,"

        Defendant.

Case No. 25-CR-92-JDR

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REVIEW AND REVOKE DETENTION ORDER

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*United States v. Capriotti*, No. 21 CR 16, 2021 U.S. Dist. LEXIS 12223 (N.D. Ill. Jan. 22, 2021) ................................................................................. 16, 17

*United States v. Cisneros*, 328 F.3d 610 (10th Cir. 2003) ....................................... 15, 18

*United States v. Cooper*, No. 3:19-mj-04254-1, 2019 U.S. Dist. LEXIS 154354 (M.D. Tenn. Sept. 9, 2019) ............................................................................ 17

*United States v. Daughtry*, No. 19-CR-0161, 2019 U.S. Dist. LEXIS 166714 (N.D. Okla. Sept. 27, 2019) ............................................................................ 15, 20

*United States v. Marseet*, 6:24-cr-6032, 2025 U.S. Dist. LEXIS 7177 (W.D.N.Y. Jan. 14, 2025) ................................................................................ 17

*United States v. Nguyen*, 24-mj-71474-MAG-1 (LB), 2024 U.S. Dist. LEXIS 196767 (N.D. Cal. Oct. 25, 2024) ...................................................................... 17

*United States v. Parks*, 670 F. Supp. 3d 1263 (N.D. Ok. 2023) .................................. 15

*United States v. Petersen*, No. 22-CR-371-JFH, 2023 U.S. Dist. LEXIS 66428  (N.D. Okla. Apr. 17, 2023) ............................................................................ 20

*United States v. Rudolph*, 582 F. Supp. 3d 804 (D. Colo. 2022) ................................ 20

*United States v. Selman*, 691 F. Supp. 3d 1334 (N.D. Ok. 2023) ................... 15, 20, 21

*United States v. Syed*, 634 F. Supp. 3d 1036  (D.N.M. 2022) ..................................... 20

**Statutes**

18 U.S.C. § 2261A(2) ............................................................................................ 12

18 U.S.C. § 3142(f) ........................................................................ 1, 13, 14, 16, 18

18 U.S.C. § 3142(g) ................................................................................................. 1

18 U.S.C. § 3145 .................................................................................................... 19

18 U.S.C. § 3145(b) ............................................................................................... 15

18 U.S.C. § 875(c) .......................................................................................... 12, 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 25-CR-92-JDR** |
| **JOHN GREGORY GARZA,**<br>**a/k/a "Mikey Chuddington,"**<br>**a/k/a "Jonathan Davis,"** | |
| **Defendant.** | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REVIEW AND REVOKE DETENTION ORDER

The United States of America, by and through its undersigned attorneys, respectfully submits this response in opposition to the defendant's Motion to Review and Revoke the Detention Order. (ECF 19.) Magistrate Judge Young B. Kim of the United States District Court for the District of Illinois properly ordered that the defendant be detained after holding a hearing pursuant to 18 U.S.C. § 3142(f) and considering the factors listed in 18 U.S.C. § 3142(g). The defendant now asks this Court to "reopen, review, and revoke the detention order" and for a "prompt hearing." (ECF 19.) For the reasons set forth below, the Court should conduct a *de novo* review of the written record and determine that detention is appropriate without an evidentiary hearing.

1

## RELEVANT BACKGROUND

### I.     Factual Background

#### A.     The Defendant's Charged Conduct

In this case, the defendant is charged with three crimes for his online conduct harassing and threatening two different women living in Tulsa, Oklahoma.  On June 8, 2024, the defendant, using a Facebook account with the name "Mikey Chuddington," sent a series of racially discriminatory and threatening messages to T.O., the husband of charged victim, A.S.  T.O. is a Hispanic man married to A.S., a white woman.  At the time of the threats, A.S. was eight months pregnant.  In his messages, sent using Facebook Messenger, the defendant told T.O., "*Stick to your own race ng gr*" and called T.O. a "*Filthy animal.*"  When T.O. responded to the defendant, "stay mad fatass," the defendant's attacks against T.O. increased as he told T.O.:

- "*Not me moron at least I'm not a filthy ngg er.  Hang from trees*"
- "*Your mudshark girlfriend will be ass r aped*"[1]
- "*Prepare*"

T.O. blocked the defendant and reported the conversation to Facebook.

Shortly after, the defendant—again using the "Mikey Chuddington" Facebook account—began making a series of threats of sexual violence against A.S.  The defendant launched his attacks on A.S. by sharing posts from A.S.'s Facebook page to the "Mikey Chuddington" Facebook page with threatening captions and then further

---

[1] "Mudshark" is a racial slur for a white woman who engages in sexual conduct with non-white (usually Black) men.

commenting on those posts with additional threats.  In rapid succession, the defendant wrote to and about A.S.:

- "*Can't wait to meet you*"

- "*[A.S.] keep that baby safe*" "*She's going to get r aped*"

- "*R ape time*"

- "*Make her a sshole bleed*"

- "*R ape her like a dog*"

But the defendant did not stop there.  The defendant recruited other Facebook users to participate in his threats against A.S., writing: "*Stanford Norrel Ethan Cuckier if I hold her down think you can make her bleed?*"  In that post, the defendant tagged Facebook users Stanford Norrel and Ethan Cuckier.  Stanford Norrel responded to the post, "*Oh I'd reckon it wouldn't be too hard for us*" with a smiley face emoji.

The defendant continued to escalate his attacks against A.S. when he contacted her via Facebook using a second Facebook account with the name "Jonathan Davis" to create the perception that multiple people were threatening A.S.  Using the "Jonathan Davis" account, the defendant continued his threats and harassment of A.S., telling her "*your slam hole belongs to me I'm not finished with you yet we know where you live*" and "*Hey! R ape time b tch.*"

At the same time, the defendant, using the "Mikey Chuddington" account, launched a series of similar attacks against M.S., a second, unrelated woman in Tulsa, Oklahoma.  As he did with A.S., the defendant used the "Mikey Chuddington"

3

account to share posts related to M.S. with threatening captions, including "*R ape like a dog*" and "*R ape her like a dog*." The defendant also commented on posts with the captions "*[M.S.] won't survive*" and "*Somebody special knows where you live. Prepare.*"

The defendant also continued his attacks on A.S. within his posts threatening M.S. Once again using the "Mikey Chuddington" account, the defendant commented on a post initially directed toward M.S., "*[A.S.] is gonna get r aped like an animal can't wait.*" The defendant also commented on a post about M.S.: "*Your a sshole is not safe neither is [A.S.].*" In both comments, the defendant tagged A.S. to ensure she knew about the threats.

Both A.S. and M.S. feared that the person threatening them was located in Oklahoma and would follow through on his graphic threats of sexual violence against them, particularly because the defendant told each woman that he knew where she lived. When A.S. and M.S. looked at "Mikey Chuddington's" Facebook page to determine if they knew the person threatening or where the person was located, they each saw a pattern of similar threatening posts and attacks against other women, particularly white women in interracial relationships. A.S. was so concerned that "Mikey Chuddington" would follow through on his threats, she contacted one of the other women he had threatened to ask if "Mikey Chuddington" had harmed her.

Both women were deeply impacted by the defendant's conduct toward them. At the time, there was no information available on either the "Mikey Chuddington" account or the "Jonathan Davis" account about where the user behind the accounts was located. Believing the defendant's threats to be true, M.S. reached out privately

4

to A.S. to warn her that the defendant was making threats to rape A.S. on M.S.'s Facebook page. A.S. reported the threats to local law enforcement and, when local police told her there was nothing they could do, to the FBI; M.S. reported the threats to her husband, a local law enforcement officer. Both women continued to suffer greatly in the aftermath of the threats. A.S. was unable to sleep, and could not stop thinking about the threats. M.S. became depressed and anxious as a result of the threats. Both women changed their daily routines, stopped going out at night alone, reduced their social media usage, and purchased weapons for self-protection.

B.      The Defendant's Additional Conduct & Violent Ideologies

During the investigation, the FBI became aware of at least 19 different social media accounts operated by the defendant and executed search warrants on six of those accounts. Within those accounts, the FBI located numerous additional individuals against whom the defendant had issued nearly identical threats of sexual violence, both before and after the defendant's threats against A.S. and M.S. For example, the defendant made the following comments to and about other Facebook users:

- *"Either way you're getting r aped and tossed in a dumpster where you belong human t rash"*

- *"[@Facebook User] ass r ape [Facebook User's] wife bloody"*; *"[@Facebook User] have any daughters?; [@Facebook User] unless there underage i don't care anyways"*

- *"Let me asshole r ape you"*

- *"She should be r aped in front of the towns square for all to see per punishment"*

- *"Ass rape her like an animal toss her body upside down in a dumpster [heart emoji]"*

- *"Filthy ni g ger lover he'll hang"; "Mud shark"; "Nasty ass pick out your rope"*

- *"R\*ape her bloody"; "Ng\*gr lover disgusting"*

- *"get ass r\*aped bloody w\*hore [heart emoji]"*

- *"Asshole r ape [Facebook User's] little sisters till they bleed frankly!"*

- *"R ape you bloody"*

- *"R ape to death bloody ass hole yummm"*

- *"R ape her bloody then toss her in a dumpster where it belongs"*

- *"you should be ass r\*aped bloody in a dungeon every single day with no shred of daylight food or water, only the sounds of the water leaking from the drain pipe to smooth your mid you fcking b\*tch."*

Additionally, the FBI located posts and messages demonstrating that the defendant identifies as part of the "incel" community. The "incel" movement—short for "involuntary celibate"—refers to a loosely organized, predominantly online community of heterosexual men who subscribe to male supremacist beliefs and frequently believe that they have been unfairly denied sexual or romantic attention from women. A central tenet within the incel community is the dehumanization of women, which often translates into the glorification of violence against women and,

6

in extreme cases, actual violent attacks against women.  One of the most famous instances of incel violence occurred in 2014 when Elliot Rodger committed a mass shooting in Isla Vista, California, killing six people and injuring fourteen others. Immediately prior to the shooting, Rodger uploaded a video detailing his plan and motives for the attack, which included his desire to punish women for rejecting him. Within the defendant's social media accounts, the FBI located posts and messages promoting the legalization of rape and celebrating sexual violence against women. The defendant also posted a portion of the video of Elliot Rodger in which Rodger described his hatred of women.  Incels often also hold white supremacist beliefs, which often manifest as a specific bias against interracial romantic relationships.   The defendant's social media posts and messages revealed a pattern of misogynistic, antisemitic, and racist beliefs consistent with incel ideology, particularly focused on a hatred of white women in romantic relationships with non-white men.  For example, the defendant posted the following comments or content using his social media accounts:

- *"Race mi xing bu llshit.  Such a beautiful white woman would never lay with a fi lthy n g r like him.  What j ew approved this?"*
- *"Legalize ra pe"*
- *"Stick to your ow n r ace mudsh ark"*
- *"Stick to your own ki nd dude"*

- *"The amount of opposite raced couples I just saw in the past 5 minutes I'm going to shoot up a shopping mall"*

- *"Fuck you stay away from white girls ng er"*

- *"Ass r ape and b eat women to a bloody pulp every chance you possibly get, by any means necessary.  Punch on sight"*

- *"We can go ass r aping in it rape everything we see"*

- *"R ape every single woman on earth"*

- *"Women will pay quite frankleeee"*

- *"Make women scared again quite frankleeee"*

- *"R ape is normal you must understand this frankly"*

- *"Ass r ape everything that breaths"*

- *"Legalize r*ape nationwide we're not completely free until we FREE THE P"*

- A meme with the caption, "*Sometimes you just gotta hit a shawty with that incel freak 'please let me rape you' stare… …"*

- A meme showing a man wearing a "RAPE EVERYONE" shirt with the caption: "*Total r*ape victory has been achieved"*

- A meme showing a man celebrating with the caption "*tfw* [that feeling when] *rape is finally Finally LEGAL"*

The defendant's posts celebrating sexual violence continued until his arrest.  In the days leading up to his arrest, the defendant posted:

- *"A steak a nice glass of wine and unlimited non stop consequence free ass r ape is all a man needs frankleee"*

- A photo of Chicago with the caption, *"Chicago as r aping [heart emoji] [snorting emoji]"*

- A photo showing a poll question "When is Rape Okay?" with the caption *"Always."*

In addition to his extremist views that glorify violence, the FBI also located social media posts and messages revealing the defendant's desire to commit an act of mass violence himself.  For example, on July 23, 2024, the defendant had a Facebook conversation with Facebook user "Stanford Norrel," the same user he had previously recruited to help him threaten A.S.  A portion of that conversation included a graphic discussion about committing an act of mass violence:

Defendant: "*I have this image of me walking into a store with a bulletproof vest on, dropping my bag, and opening fire.*"

Defendant: "*Metaphorically speaking.*"

Defendant: *"In my mind." "I wanna die in a shootout with sw at team."*

Stanford Norrel: "Same honestly I've been snacking all day."

Defendant: "*I don't think I can go another year with out a girlfriend.*"

Stanford Norrel: "I want to take out a least a few niggas before I go."

Defendant: "*In a metropolitan area you can get 100 easy.*"

Stanford Norrel: *"Especially if you're up in a balcony.*"

9

Defendant: "*If you have good aim yeah*"

Stanford Norrel: "Not enough niggas throw ger ger n@!des"

Stanford Norrel: "Imagine just tossing like 10 of them down into a crowd"

Stanford Norrel: "Mass casualties"

Stanford Norrel: "Think about how funny that would be"

Stanford Norrel: "Limbs and arms flying everywhere"

Stanford Norrel: "Then rig up see fore at all the exits"

Defendant: "*Bruh*"

Defendant: *"That's like cheating"*

Defendant: *"The sensation of a hundred headshots in a span of 10 seconds into a crown would feel beytrr"*

Stanford Norrel: "This is all for our movie that were writing of course."

Stanford Norrel: "Why not both."

Defendant: "*Grenade is too gruesome.*"

Stanford Norrel: "I like viscera."

Defendant: "*A 9year old flying into pieces lmao.*"

Defendant: *"Brutal."*

Stanford Norrel: "Seeing people torn apart is arousing to me."

Stanford Norrel: "Lol her backpack flying through the air."

Defendant: "*9 year olds head with a goofy expression flying at the camera like 3D lmao.*"

Stanford Norrel: "Slow-motion with you dying of laughter in the background" "you're probably wondering how I got here."

The defendant continued to discuss committing an act of mass violence. On July 24, 2024, the defendant posted: *"My life is a nightmare that never ends. I might go out in a blaze of glory. Get ready to see me on the news in a hostage situation. People will know who I am."* On July 26, 2024, the defendant wrote: *"I'm 24 years old it's now or never"*; *"I will s\*hoot up a planned parenthood if I don't have a girlfriend by 30"*; *"I'm gonna go crazy."* On August 2, 2024, the defendant posted: *"Anyone have a semi automatic I can borrow preferably in Illinois, for recreational purposes. Something untraceable."* On August 17, 2024: *"Heading to the shopping mall now. You'll see me on the news in about 20 minutes. Love you guys."* On August 22, 2024, the defendant posted: *"When I'm taken into custody for a mass m urder they're going to report 'the perpetrator posted that morning on Facebook "good frankleee morning frens"…'"* On October 15, 2024, the defendant engaged in a chat with another Facebook user and wrote, "*Do you know what existentialism is."* When the other user replied, "I don't think so," the defendant responded, "*it's the feeling of feeling insignificant, like you can change nothing or affect the universe in no real way. Like there is no meaning or beacon of light to reach for"*; *"That's how I interpret it"*; *"That's why you have mass shooters."* On November 25, 2024, the defendant posted a video showing two professional wrestlers in a ring with the comment *"Me and [another Facebook User] meeting at a crowded shopping mall, strapped up for undisclosed reasons (we both know what we're about to do, we won't make it out alive)."*

11

The defendant has also expressed an interest in certain individuals known for committing acts of violence. In addition to Elliot Rodger, discussed above, the defendant has also posted about and discussed Dylann Roof, a white supremacist who committed a mass shooting in 2015 at a Black church in Charleston, South Carolina, killing nine people. Roof later admitted that he had committed the shooting hoping to incite a race war. On March 22, 2024, the defendant wrote *"I am Dylan roof and Elliot Rodger in one."* Similarly, on July 13, 2024, the defendant wrote *"I understand why people like Dylan roof do what they do."* Dylann Roof is On August 26, 2024, the defendant wrote, *"Everyday I become muntraore and more like Chris Benoit and that's not a joke."* Chris Benoit was a professional wrestler who, in 2007, murdered his wife and seven-year-old son before killing himself. That same day, the defendant also posted *"I'm gonna h urt myself and others."* In response to that post, another Facebook user asked the defendant *"Are you meeting Dillian."* A third Facebook user responded "Yuuuup," and the defendant replied *"Up."* The FBI believed that "Dillian" referred to Dylann Roof, and that the defendant's reply, *"Up"* was an affirmative response to the question.

During the investigation, the FBI determined that the defendant worked in the firearms and ammunition department at Wal-Mart.

## II.    Procedural History

On March 17, 2025, a grand jury sitting in the Northern District of Oklahoma charged the defendant with two counts of violating 18 U.S.C. § 875(c) and one count of violating 18 U.S.C. § 2261A(2). Counts One and Two allege that the defendant

communicated threats of physical harm in interstate commerce against A.S. (Count One) and M.S. (Count Two). Count One includes a Special Finding that the defendant selected A.S. as the target of his offense because of the actual or perceived race, color, ethnicity, and gender of any person; Count Two includes a Special Finding that the defendant selected M.S. as the target of his offense because of the actual or perceived gender of M.S. Count Three alleges that the defendant cyberstalked A.S. and includes a Special Finding that the defendant selected A.S. as the target of his offense because of the actual or perceived race, color, ethnicity, and gender of any person. Each count carries a maximum penalty of five years in prison. The facts supporting these charges are documented extensively in the Government's Memorandum in Support of Detention (ECF 8), which the government incorporates by reference herein and attaches as Exhibit A to this Response.

On March 19, 2025, the defendant was arrested in Chicago, Illinois and brought before the District Court for the Northern District of Illinois for an initial appearance, where the government moved orally for detention. The following day, March 20, 2025, the government submitted a lengthy Memorandum in Support of Detention, setting forth the various bases on which pretrial detention of the defendant was warranted. Specifically, the government laid out facts and proffered evidence that the defendant, by clear and convincing evidence, posed a danger to other persons and the community, and that the defendant, by a preponderance of the evidence, posed a serious risk of flight. Magistrate Judge Young B. Kim held a detention hearing pursuant to 18 U.S.C. § 3142(f) on March 21, 2025, where both the government and

13

the defendant presented information by proffer.  The defendant appeared at that hearing and was represented by counsel, had the opportunity to testify, the opportunity to present witnesses, the opportunity to cross-examine witnesses, and the opportunity to present information by proffer or otherwise.  The defendant, through counsel, presented information by proffer.  Magistrate Judge Kim ordered the defendant detained on the basis of danger to other persons and the community and risk of flight and issued a written order.  (*See* ECF 8 at 8.)[2]  The defendant was subsequently removed to the Northern District of Oklahoma for further proceedings.

## LEGAL STANDARD

The Bail Reform Act of 1984 provides two ways in which a detention order can be reconsidered before review on appeal by a court of appeals.  First, under 18 U.S.C. § 3142(f), a detention hearing "may be reopened before or after a determination by a judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community."  18 U.S.C. § 3142(f).  This section is inapplicable here because it "applies to reconsideration of a detention or release order *by the same judicial officer* who entered the initial order" and, even then, "only when there is new

---

[2] The government ordered a transcript of the detention hearing proceedings before Magistrate Judge Kim, but as of the date of this filing has not yet received a copy of the transcript.  The government will supplement its filing with a copy of the transcript for the Court's review, at the Court's request.

information that would materially influence" the decision to detain or release the defendant. *United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003) (emphasis added); *see also United States v. Parks*, 670 F. Supp. 3d 1263, 1269 (N.D. Ok. 2023) (collecting cases) ("[R]eview of a detention or release order is available only when the same judicial officer who entered the original order conducts such review and when new information arises."). Thus, this Court cannot "reopen" Magistrate Judge Kim's March 19, 2025, detention hearing.

Second, and applicable here, under 18 U.S.C. § 3145(b), a defendant may file with the court having original jurisdiction over the offense a motion for revocation or amendment of the detention order. Under § 3145(b), a district court acts *de novo* and must make its own independent determination of whether pretrial detention is appropriate. *Cisneros*, 328 F.3d at 617. By its terms, nothing in 18 U.S.C. § 3145(b) entitles a defendant to a second hearing. A "district court has the discretion to hold an evidentiary hearing if it determines that additional evidence is necessary or it may rule on the written pleadings and evidence if the factual record is sufficient." *United States v. Selman*, 691 F. Supp. 3d 1334, 1340 (N.D. Ok. 2023) (quoting *United States v. Daughtry*, No. 19-CR-0161, 2019 U.S. Dist. LEXIS 166714, at *2 (N.D. Okla. Sept. 27, 2019)).

## ARGUMENT

The defendant is charged with an increasingly violent pattern of online conduct targeting women and interracial couples. For over a year he used at least 18 different social media accounts to launch a campaign of racist and misogynistic harassment that

included graphic threats of sexual violence and physical harm.  The defendant should be detained pursuant to 18 U.S.C. § 3142(f)(1) pending trial on the charges that resulted from this conduct.

## I.    The Defendant Is Charged with Crimes of Violence and No Conditions of Confinement Can Protect the Safety of the Charged Victims and the Community and Reasonably Assure His Appearance

The government explained in its Memorandum in Support of Detention (ECF 8) why the defendant should be detained pending trial.  As explained in more detail there, the defendant is charged with crimes of violence, and no condition or combination of conditions can assure the safety of the charged victims and the community or the defendant's appearance in Court.  *See* Ex. A at 6 at 13–19.  None of the arguments or information in the Defendant's Motion changes that.

The defendant argues that he should be released because the charges "do not allege any actual physical violence or even physical proximity."  Def. Mot. at 3.  The government anticipated and refuted that claim in its Memorandum in Support of Detention, explaining: "[t]hreats, particularly those as explicit, graphic, and repeated as those alleged in this case, harm people.  They terrorize people. They affect the safety, security and well-being of people.  They induce fear."  *See* Ex. A at 17 (quoting *United States v. Capriotti*, No. 21 CR 16, 2021 U.S. Dist. LEXIS 12223, at *14 (N.D. Ill. Jan. 22, 2021)).  Recognizing the danger posed by such threats, courts frequently detain defendants charged with violating 18 U.S.C. § 875(c) even when those defendants have no physical proximity to their victims.  *See, e.g.*, *Capriotti*, 2021 U.S. Dist. LEXIS 12223, at *13 (detaining defendant who left a threat by voicemail from

Illinois to Washington, D.C. even where "the government alleged no actual physical harm or violence upon anyone from the Defendant" and the defendant had not traveled to Washington, D.C.); *see also United States v. Marseet*, 6:24-cr-6032, 2025 U.S. Dist. LEXIS 7177, at *2 (W.D.N.Y. Jan. 14, 2025) (detaining defendant charged with sending threatening communication from Colorado to New York); *United States v. Nguyen*, 24-mj-71474-MAG-1 (LB), 2024 U.S. Dist. LEXIS 196767, at *2 (N.D. Cal. Oct. 25, 2024) (detaining defendant charged with communicating threats from California to Boston, Massachusetts); *United States v. Cooper*, No. 3:19-mj-04254-1, 2019 U.S. Dist. LEXIS 154354, at *1 (M.D. Tenn. Sept. 9, 2019) (detaining defendant charged with communicating threats from Tennessee to Washington, D.C., on basis of danger alone). The defendant's claim that the Court can order him to have no contact with the victims or any potential witness is similarly unavailing because "the making of the threats themselves represent a harm to the community, so that without reasonable assurance that the threats themselves will stop upon release, the Court cannot issue a release order." *Capriotti*, 2021 U.S. Dist. 12223 at *12–13; *see also Cooper*, 2019 U.S. Dist. LEXIS 154354, at *10 (explaining that "[b]ecause the alleged threatening conduct takes place on the internet, likely accessed from [defendant's] home, it is particularly difficult to control with conditions of pretrial release). The volume and scope of the defendant's threats, including the use of at least 19 known different social media accounts, and the scores of potential victims prevent any such reasonable assurance. As set forth in detail in the government's Memorandum in Support of Detention, (Ex. A at 15–19), clear and convincing evidence established and

continues to establish that the defendant poses a significant danger to the women he has already threatened, as well as the community more broadly, and no condition or combination of conditions would alleviate those risks.

Additionally, as set forth in the government's Memorandum in Support of Detention, the defendant poses a serious risk of flight, and no condition or combination of conditions will reasonably assure his appearance in court, and none of the defendant's arguments are persuasive.  Because the defendant is charged with crimes of violence, which he does not dispute in his Motion, the applicable standard is not whether he presents an "uncontrollable flight risk," (Def. Mot. at 4), but whether any condition or combination of conditions will "reasonably assure the appearance" of the defendant.  18 U.S.C. § 3142(f)(1).  Even if standard set forth in § 3142(f)(2) applied, the government has established that the defendant poses a "serious risk" of flight.  The government must only prove this factor by a preponderance of the evidence.  *See Cisneros*, 328 F.3d at 616.

The defendant has no known ties to Oklahoma and little incentive to appear for trial in Oklahoma if he is released.  By his own admission, the defendant cannot drive and does not own a car.  Based on his intermittent hourly employment, the defendant appears unlikely to have the means to return to Oklahoma to appear in court.  Moreover, while the defendant contends that he should return to Illinois where he has family, (Def. Mot. at 4), the defendant has only one known family member, an aunt, in Illinois.  The defendant offered information at his initial detention hearing that his aunt could serve as a third-party custodian for the defendant, but Magistrate Judge

18

Kim did not find that option viable, nor did Pretrial Services in the Northern District of Illinois. Moreover, the new information that the defendant suffers from an alcohol use disorder presents an additional aggravating factor, both as to the danger the defendant poses and his likelihood to appear in Oklahoma. Releasing the defendant to outpatient treatment in Illinois does nothing to alleviate the concerns that he will fail to return to Oklahoma. Releasing the defendant to treatment in the Tulsa community would significantly *increase* the danger to his victims, with whom he would then have the physical proximity that he contends mitigated the seriousness of his crime. If the defendant were unsuccessful in addressing his alcohol use, any continued use would likewise pose a serious risk that his threatening conduct would continue or escalate.

Additionally, as set forth in the government's Memorandum in Support of Detention, the defendant poses a serious risk of flight based on the gravity of the charges and their penalties, as well as the numerous threats the defendant has made against other individuals all over the country, which remain under investigation. Those factors, therefore, establish by a preponderance of the evidence that the defendant poses a significant flight risk, and no condition or combination of conditions can alleviate that risk and reasonably assure that the defendant appears in Oklahoma.

## II.    The Factual Record is Sufficient and an Evidentiary Hearing is Unnecessary

The Court should deny the defendant's request that it hold a hearing "pursuant to 18 U.S.C. § 3145." Def. Mot. at 1. The term "hearing" does not appear in 18 U.S.C. § 3145 and the Court can resolve this issue on the written record. *See Selman*,

691 F. Supp. 3d at 1339–40. To be sure, this Court has "the discretion to hold an *evidentiary* hearing if it determines that additional evidence is necessary . . . ." *United States v. Daughtry*, 2019 U.S. Dist. LEXIS 166714, at *6 (emphasis added). But the defendant has not identified any witnesses who would testify or any new evidence that would be presented at such an evidentiary hearing. He has alleged in his motion that he now seeks rehabilitation for alcohol use and that he does not have a car, but surely this Court can consider that proffer and conduct its *de novo* review on the written filings without resort to an evidentiary hearing. *See Selman*, 691 F. Supp. 3d at 1339–40 (completing *de novo* review of a detention hearing by reviewing the motion and other filings); *United States v. Petersen*, No. 22-CR-371-JFH, 2023 U.S. Dist. LEXIS 66428, at *5 (N.D. Okla. Apr. 17, 2023) ("As Defendant's Motion does not present any additional argument, facts, or evidence not previously presented in his original motion for release or at the change of plea hearing, the Court finds that a hearing is not necessary and will, therefore, conduct its *de novo* review based on the record."); *see also United States v. Syed*, 634 F. Supp. 3d 1036, 1044 (D.N.M. 2022) (completing *de novo* review of a detention hearing by considering written arguments, transcripts, the defendant's Pretrial Services Reports, and the applicable law); *United States v. Rudolph*, 582 F. Supp. 3d 804, 807 (D. Colo. 2022) (determining "[n]o hearing is necessary to resolve the Motion for Temporary Release and Motion to Revoke").

The factual record, as developed through the government's Memorandum in Support of Detention, the transcript of the detention hearing before Magistrate Judge Kim, and the defendant's newly proffered information provides a thorough basis on

which to review the order of detention, and an additional evidentiary hearing is unnecessary. *Selman*, 691 F. Supp. 3d at 1340.

## CONCLUSION

For all the reasons stated above and in the government's other filings, the Court should deny the defendant's motion review and revoke his detention order.

DATED:    April 23, 2025

CLINTON J. JOHNSON                HARMEET K. DHILLON
United States Attorney            Assistant Attorney General
Northern District of Oklahoma     Civil Rights Division


BY:  */s/  Shakema M. Onias*          BY:  */s/ Chloe M. Neely*
     Assistant United States Attorney      Trial Attorney
     United States Attorney's Office       Civil Rights Division
     Northern District of Oklahoma         U.S. Department of Justice
     110 W. 7th Street, Suite 300          150 M Street NE
     Tulsa, Oklahoma                       Washington, DC 20530
     (918) 382-2768                        (202) 765-5367
     Shakema.Onias@usdoj.gov               Chloe.Neely@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2025, I electronically filed the foregoing with the Clerk of the Court using the electronic filing system, ("ECF"), which sent notification to all parties of record.

*/s/ Chloe M. Neely*

Chloe M. Neely
Trial Attorney, Civil Rights Division
