IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 25-CR-92-JDR |
| | ) |
| JOHN GREGORY GARZA, | ) |
| a/k/a "Mikey Chuddington," | ) |
| a/k/a "Jonathan Davis," | ) |
| | ) |
| Defendant. | ) |

**REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REVIEW AND REVOKE DETENTION ORDER**

After reviewing the initial detention hearing transcript (attached as Exhibit A), John Gregory Garza, by and through undersigned counsel, again respectfully moves this court to review and revoke the Order granting the government's oral motion for detention. Mr. Garza submits this transcript further supports his motion for a *de novo* detention hearing pursuant to 18 U.S.C. § 3145.

Both parties agree that this court may conduct a *de novo* review regarding detention. The Government requests that this review be solely of the written record, arguing there is no need for an evidentiary hearing. However, the written record does not accurately represent Mr. Garza's circumstances or interests, past or present. Reviewing the initial detention hearing transcript, Mr. Garza's current counsel has found material misunderstandings that lead to the outcome in the first detention hearing. Additionally, further investigation has demonstrated new relevant information that Mr. Garza wishes this court to consider.

1. **Mr. Garza's Aunt as a Third-Party Custodian.**

Based on the transcript of the initial detention hearing, a strong factor in favor of detention was the supposed inadequacy of Mr. Garza's Aunt, Lynda Luka, as a third-party custodian. *See*

1

Ex. A at 13. This determination appears to have been made primarily on the pretrial report which indicated that Ms. Luka was not "tech savvy" and that she had stated that Mr. Garza would need to be employed in order to live with her. *Id.* at 6. Although Magistrate Judge Kim asked Mr. Garza's attorney, Ms. Ahmad, about this issue, Ms. Ahmad was unable to meaningfully answer or respond to any inquiries regarding Ms. Luka. *See id.* at 10. Ms. Ahmad did inform the court that Ms. Luka was present in the courtroom at the initial detention hearing and the court could ask her questions directly, but this did not occur. *Id.*

Mr. Garza's current trial counsel team has since spoken with Ms. Luka on several occasions. While Ms. Luka does not have Wi-Fi at her house, and would not be considered a technophile, she does have a cellphone and a basic understanding of technology. Further, she has assured counsel that she is willing to learn about whatever technology necessary to properly supervise Mr. Garza and is confident that she can handle the task. Additionally, Ms. Luka has rebutted the assertion that she told pretrial services that Mr. Garza needed to contribute financially if he wanted to live in her house. She insists that she told pretrial services that he *could* work if he wanted to, but that she has told Mr. Garza on many occasions that he does not *need* to work, and she can support him even if he does not work. As such, the written record does not accurately depict Ms. Luka's ability to be a third-party custodian of Mr. Garza. If anything, it is evident that Mr. Garza has a supportive and committed family member who is willing and able to care for Mr. Garza should he be released and allowed to return to Illinois. As for Mr. Luka's technological capabilities, it is difficult to imagine that no set of conditions and instructions exist which would allow Ms. Luka to monitor Mr. Garza's technological use. Ms. Luka may not be the most "tech savvy" person out there, but she would serve as competent third-party custodian for Mr. Garza.

### 2. Concerns Regarding Mr. Garza's Employment.

Another one of Magistrate Judge Kim's concerns was Mr. Garza's likelihood of employment should he be released. *See* Ex. A at 13. As discussed above, there was a misunderstanding that Mr. Garza would have to be employed to live with Ms. Luka. However, there is no evidence that obtaining and maintaining employment would be an issue for Mr. Garza. At the time of his arrest, Mr. Garza had two steady jobs at both Walmart and CVS. He had worked at Walmart previously from 2019-2020 and 2021-2022 and had also worked at FedEx, Target, and Dollar Tree at various points in the last few years. Additionally, Mr. Garza's counsel team spoke with Bill Pinazzo, the manager at the CVS in Chicago where Mr. Garza was employed, who said that if it was up to him Mr. Garza would be able to come back to work. Mr. Pinazzo said he never had a problem with Mr. Garza and that he was a good employee.

### 3. Risk of Flight

Magistrate Judge Kim found that the Government had demonstrated that Mr. Garza posed a "substantial risk of flight." Ex. A at 13–14. However, Magistrate Judge Kim did not clarify his reasons for this finding other than it was for the "same reasons" that he found that the Government had demonstrated by clear and convincing evidence that there was a serious risk to the community. *Id.* at 13. The Government's Response cited to the Government's Memorandum in Support of Detention, which argued that Mr. Garza's lack of criminal history indicates a substantial risk of flight—"the gravity of the charges and penalties the defendant faces create a strong incentive to flee. The defendant faces a potentially significant sentence of incarceration; namely. . . a maximum sentence of five years imprisonment on each count. For the defendant, who has no prior criminal history, any term of incarceration will be significant." Dkt. No. 8 at 19. This logic is flawed. First, because it would be completely unfair to punish Mr. Garza for his <u>lack</u> of criminal history. Second,

any possible term of incarceration is significant for any defendant. The Government could just as easily argue that a career criminal poses a flight risk because he has a significant criminal history and would not want to return to incarceration. No one looks forward to a term of incarceration. Should Mr. Garza's lack of criminal history be considered a factor in favor of detention it would place defendants in impossible Catch-22 scenarios where both their criminal history or lack thereof is a detriment to their release.

The Government's only other arguments seem to be that Mr. Garza *may* have additional criminal charges brought against him, giving him "little incentive to appear for trial in Oklahoma," and that he is a resident of Chicago and has no known ties to the state of Oklahoma. While these factors may indicate a concern regarding nonappearance, they do not indicate that he poses a "flight risk."

> It is clear that flight and nonappearance are not simply interchangeable names for the same concept, nor are they merely different degrees of the same type of risk. In the context of measuring and managing risks, many defendants who merely fail to appear differ in important ways from their fugitive cousins. Precision about these distinctions is constitutionally mandated and statutorily required.

Gouldin, Lauryn P., Defining Flight Risk, University of Chicago Law Review, Vol. 85, pp. 677-742 (April 12, 2018), Available at SSRN: https://ssrn.com/abstract=3161822; *see also United States Of America v. Willie White*, 2021 WL 2155441 at *10 (M.D. Tenn. 2021) (recognizing that "serious flight risk" is "narrower" than "flight risk" and is "distinct from risk of non-appearance"). This is further exemplified by the language of the statute cited by the Government in its Response. 18 U.S.C. § 3142(f)(2) requires that the government must demonstrate that the defendant poses a "serious risk that such person will *flee*."[1]

---

[1] The government cites to 18 U.S.C § 3142(f)(1) because it characterizes the charge(s) as a "crime of violence." The government cites unpublished and district court opinions to justify this claim. *See* Dkt. No. 20 at 13-15. It has not demonstrated through binding precedent that either statute is

The Government's arguments do nothing more than accurately represent that Chicago, Illinois, and Tulsa, Oklahoma are not geographical neighbors. However, such a fact does not make Mr. Garza more or less likely to be a "flight risk." The core of the concern appears to be that it could be difficult for Mr. Garza to transport himself from Chicago to Tulsa for court appearances, which is wholly divorced from Mr. Garza's likelihood of fleeing to evade criminal prosecution. As was discussed above, Mr. Garza has a family member who is willing to assist him in necessary travel and he has demonstrated his ability to maintain steady employment. Additionally, Mr. Garza receives payments from his father's pension that would allow him to obtain necessary transportation to Oklahoma. Finally, even if this court agrees with the government that the charge(s) are a "crime of violence," Mr. Garza has demonstrated that there are plenty of conditions that would reasonably assure his appearance in Oklahoma when necessary. *See* 18 U.S.C. § 3142(f)(1).

## CONCLUSION

To properly consider all relevant information, including but not exclusive to the issues discussed above, Mr. Garza requests this Court to conduct a *de novo* detention hearing.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER
JULIA L. O'CONNELL, FEDERAL PUBLIC DEFENDER

By:   *s/ Whitney R. Mauldin*
      Whitney R. Mauldin, OBA #22228
      Assistant Federal Public Defender
      Williams Tower I, Suite 1225
      One West Third Street
      Tulsa, Oklahoma 74103-3532
      Telephone: (539) 302-8780
      Facsimile: (918) 581-7630
      E-mail: whitney_mauldin@fd.org
      *Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I certify that on April 30, 2025, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Chloe M. Neely
Shakema Onias
Assistant United States Attorneys

*s/ Whitney R. Mauldin*
Whitney R. Mauldin